Case No. 18-5356, Stephen Aguiar, Appellant v. Drug Enforcement Administration. Ms. Fasol for the Appellant, Mr. Walker for the Appellant. Good morning. Good morning, Judge Rogers. Thank you and may it please the Court. Stacey Fasol, Court-Appointed Amicus in support of Appellant. At issue in this case is Mr. Aguiar's request for GPS tracking data in the form that the DEA itself viewed that data during its investigation of Mr. Aguiar and the form in which the DEA presented the data to the jury during Mr. Aguiar's trial, that is plotted on a map. In response to Mr. Aguiar's request, the DEA provided Mr. Aguiar with 351 pages of longitude and latitude coordinates and has refused to provide Mr. Aguiar with the data in the usable map form that he has requested. It is undisputed where the agency has not said that the records it used for the investigation and the trial are no longer in existence? Correct, Your Honor. The agency has said that the map images that it used at trial are no longer, that they were unable to locate those and the DEA has not disputed in this case that it can readily convert the GPS data into map images. And by its plain language, FOIA requires the DEA to provide the data in that readily reproducible form. Talking about a piece of physical evidence and the agency searched for it or even a description of a piece of physical evidence that was introduced at trial and the agency was unable to locate it, what would the result be? If the agency conducted a reasonable search and was unable to locate it, then the requester would not necessarily be entitled to that information, but for the provision at issue here, which is 552A3B and which entitles a requester to the form or format that he or she requests as long as it is readily reproducible in that form or format. And here, the information at issue is the GPS tracking data, which presupposes a map. A map is simply another way of viewing, displaying, manifesting that very data. And in fact, that is why when the DEA was tracking Mr. Aguiar in real time, it viewed a map image of the coordinates. It didn't view a list of the coordinates, even though it has stored them in that way. And so one idea, but another idea is simply a tracking idea. You know, if you're on a map, where are you? And you write it down, but there's no map as such necessarily. So I just want to be clear, is it your position then that the text of the statute is such that in my hypothetical of a written description of a physical piece of evidence, for example, a gun, the agency would be required to recreate that? No, Your Honor. I think if you're actually having to change the substance of the information that the agency actually has, that would be creating a new record and would not be a former format. I'm trying to make this hypothetical clear, and I'm not. If there had been a memorandum describing the gun that was introduced at this trial, and now the government, a FOIA request has been made that's specific enough, and the agency has conducted a reasonable search and is unable to find either the gun or the memorandum describing the gun. I want to be clear what you think the law is in terms of what is the agency's responsibility regarding that request. I don't think, Your Honor, that the agency would have to recreate that. I think the agency's obligations only extend to information that it has in its possession and control. And so here, the agency undisputedly has the GPS record, and so it would have to tracking data. It has it in one particular form. It has it in the coordinate form, but it is required to produce that in another form or format that is requested. And so I don't think that the agency is obligated to create information that it no longer has. But where it does have that information, the 1996 FOIA amendments make clear that the way in which the information is stored does not matter anymore, and the requester is entitled to his or her preferred form or format of that information. And so I do think that map images very easily fit into the statutory language here for the very reason that the DEA regularly in its business views those coordinates in that very map form. Do we have any reason to think that they ever use or view it in anything but the map form? I know Agent Carter talked about being able to view these maps and see these patterns of travel on Mr. Aguiar's part, and we also have pretty illegible copies in the record of the maps that were introduced at trial. Do we know whether they ever look at the numbers, for example, to see patterns or look at it in the form that they provided it? I don't think so, Your Honor. The DEA certainly has never argued that, and the record does not reflect that it does. What the record reflects is that when the DEA uses GPS monitoring in its business, it uses an interface now, a software before, that allows it to view that data in real time in the map image and not as a list of coordinates. And I think this is similar to a situation where now within the modern era of technology, agencies may store information in a way that is readable by a computer, for example, the GPS coordinates here or a binary code, but then when they actually use that information in a way that's understandable to the human eye, it requires some sort of processing, and that is exactly what the GPS data here requires and how it is intended to be viewed in the map form. Help me, and here's what my first question was all about. He asked for a CD from the DEA containing the DEA computer files of all the exhibits. Between these two dates, about six months apart, the very same files used by DEA to prepare exhibits for trial. Isn't that what he got? No, Your Honor. I believe his request, which must be construed broadly, was for all images associated with the tracking information, and the DEA, once it provided the CD with only the longitude and latitude coordinates, it has always been understood, as it was by the district court, that Mr. Aguiar's alternative request is for the agency to use its mapping technology to put that data into map form, and the DEA has certainly never indicated that that was not included within Mr. Aguiar's original request or that his original request was not specific enough to require the DEA to put the images, put the GPS coordinates into map form. In your brief on page 30, you refer to the district court's decision taking the view that, quote, creating the maps would inputting data into a computer program to generate thousands of individual map images, and you respond that visual maps are required, but you never dispute the notion that thousands of images would be required, and, you know, one of the issues in contention is whether the agency is being called on to exercise judgment in creating new documents, and I had been assuming until I read that page that, and you didn't take issue with the characterization of thousands of individual map images, that what Mr. Aguiar was seeking was not one separate map for every ping, but a map showing all the coordinates of a particular journey. That's right, Your Honor. Mr. Aguiar is seeking, he's not seeking a map for every ping. He would need to be able to see, to differentiate the coordinates from one another, so it may be that it can't be that all the coordinates, I assume that it would not be that all the coordinates could fit on one map, not in the record exactly how many maps would be required, but certainly the DEA could produce maps that contain multiple coordinates consistent with Mr. Aguiar's request. So the question is, I think the legal question for you is, to the extent that the case law says, you know, differentiates an existing document from a document generated in response to a FOIA request, one of the factors that the cases look at is whether the government would have to use judgment in kind of creating new records. And what's your response to that on this issue, where obviously Mr. Aguiar would not find useful a separate map for each ping, and he also would not find useful one map with all the coordinates on it. So what's the unit and why is that not requiring the DEA to make a new judgment that is essentially creating records for the FOIA response? I think, Your Honor, the test for former format is whether there's a change in the content in which it would not be a new former format or just a change in the physical attributes. And likewise, when we're talking about judgment, if the request requires the agency to make judgments or analysis about the content, like summarizing information, that's creating a new record. But if there's no change in the underlying content, but there may be some judgments about the physical attributes that have to be made, that does not take us out of the former format language. And in fact, even under the DEA's narrower reading that is not in the text that would limit it to electronic or non-electronic or coded or uncoded or the like, you would still have the problem of there's always going to be certain judgments about the type of CD or the weight of paper or what kind of Excel spreadsheet or Google spreadsheet. And so a lot of times that will just be a factor of what the tools that the agency uses to readily reproduce the document. And here, of course, the agency has not disputed that it could do so and has not said here that really this request would require all kinds of judgments. Mr. Aguiar is only seeking that the agency use the tools to put the GPS coordinates into map form. No, in fact, they don't seem to be disputing that. They seem to be preparing, if they lose, to give you thousands of individual map images, each with one ping. I think, Your Honor, I read the DEA as saying that it would need to put enough maps that the pings would be discernible from one another. But I do think that that judgment would be up to the agency, likely. And I do think there's guidance in the 1996 amendment's purpose, which is to enhance the usefulness of information and use technology to make sure that requesters are getting access to information in usable form. So I think as long as the DEA is providing the information in a usable form that satisfies the request issue, that would be satisfying the agency's obligation. So it would satisfy its obligation if each ping were discernible but not mapped as a journey? I think, Your Honor, what Mr. Aguiar is seeking here is just to see the GPS coordinates plotted on maps. He has not requested that they be plotted as a journey, though he is, again, seeking it in the form that the DEA viewed it. And presumably, that form and the way that it is presented at trial often includes multiple pings, for example, from the same day on a map. So I do think the form that the agency views it and the form that its technology would use presumably would have multiple pings on the same map. So I had my hypothetical about the gun because I thought it was easy. I thought here, and the reason I went back to his original request was I thought the language he used was attempting to eliminate the concerns about agencies having to exercise judgment when he said, I want exactly the very same file that the agency used. So the agency knows how many pings it put on a map, which ones it introduced, et cetera. So the argument, as I understand it, is that a map form is not simply another form or format. It's a completely new representation of information. And the agency is not obligated to do that. And I thought that was sort of the district court's concern that I, Mr. Aguiar, would be getting this additional information. What's the best response to that? I think, Your Honor, that the test cannot be whether the form creates or requires creation of additional information. And the reason why is because I think all forms inherently require additional information that is particular to that form. So, for example, if the agency kept data sets but regularly produced them into graphs or pie charts that would be other forms, those need to add the pie or the X and Y axis. Those are sort of physical features that are particular to that form. Here, the GPS coordinates, which presuppose a map, which are simply the longitude and latitude position on a map, presuppose that there's a map that allows a user to understand the physical location of those GPS coordinates. And so, as long as the information that is added is not altering or analyzing the content at issue, then it is simply another form or format where the added information is incidental to, is part and parcel of the very form that's being requested. And that is the case with a map. And here, the agency would read limitations into the statute that simply are not there. And it is undisputed that an agency, for example, would have to, you know, print paper that's only kept electronically. And so, just as that's not creation of a record, putting the GPS coordinates in the way that the agency usually views them is not creation of a record. So, you draw the line at adding or changing information? Correct. I would draw the line at whether you are changing the substance of the underlying information. And as you just said, I believe the way, the touchdown would be the way the agency ordinarily uses the data. Yes. Yes, Your Honor. I think that in a case such as this where the agency ordinarily in its business uses the data in that way, it's very easy to see that the requested form or format fits within that broad, any form or format language. Do we, I mean, what do we know about the way, I mean, obviously we can ask Mr. Walker, but what do we know about the way the agency ordinarily uses the data? We have the trial exhibits. Yeah. But more, you know, in Mr. Carter's testimony, he talks about referencing maps. Can you tell us to the extent that you know the specifics about where and how, was it back at the office? Was it in the car? Was it on the smartphone? Just remind us what the record has on this. Yes, Your Honor. I believe that Mr. Agent Carter's testimony was that he would view the maps in real time at a computer. I don't recall that he specified, but I got the sense that it was from an office. And so in real time, when he would want to request, you know, a ping, what send up, you know, to the satellite to show the coordinate, he would view that in on the computer and would view Mr. Aguiar's movements on a computer. And then of course, in addition, in map form, would view them on a computer in map form. Showing, I mean, like I can look at a car calling app and see that my child has used my account to go drop a friend off and another friend and come home. And I see the whole trip. Do we know whether when Mr. Carter was looking, was he just seeing the car or was he seeing that he had been down, you know, route seven and across Spear Street? He would see it for as many times as he put in the ping. So sometimes he was monitoring Mr. Aguiar around the clock. And so in that case, he would be putting in pings every minute or so. And he would see the car traveling somewhere, for example. So he would only see what someone with a helicopter and a lot of time on their hands would see. He would see where the car was, as you say, in real time, but not the path, the journey. Correct, Your Honor. The only way he would see the path is by, you know, repeatedly pinging while he was monitoring and seeing the path in that way while he was monitoring. Does that make sense? Yeah, but it's also different from the trial exhibit. Well, correct, Your Honor. There's no such thing now as producing, you know, the real time. They could produce that and they'd presumably show Mr. Aguiar's car in some impoundment lot somewhere. Correct, Your Honor. So what Mr. Aguiar is seeking is the coordinates that the DEA has given him, the 351 pages of his, that tracked his movements from 2009, plotted on a map. On many maps? On potentially many maps. The same maps, but potentially it would need to be, if they were printed, would need to be printed multiple pages. Yes, Your Honor. But, of course, the DEA hasn't disputed that it can readily do that and printing a large volume of documents is often required for complying with a FOIA request. And to your question, I think a second way that the DEA used the GPS coordinates was by, I believe the record reflects, putting them into a software and printing those images for trial. And that might be much closer to what Mr. Aguiar is requesting here. The agency, in fact, I believe the record shows that at least their old technology couldn't necessarily print from the same software that they were using in real time, but they would often put the GPS coordinates into a web-based interface and print it on Google Maps or the like to, again, make those GPS coordinates readable and understandable to the jury and to the DEA itself. Do you know offhand what happens when agency records are destroyed pursuant to agency retention standards and guidelines and rules and regulations, etc.? So, a lot of documents existed at the time of his trial. Pursuant to the standard federal government agency destructions timetable, they no longer exist. How does that affect your, Mr.? I don't think it does affect Mr. Aguiar's request and I actually think, Your Honor, that that's exactly what the 1996 amendments were intended to cover is a situation where an agency may only keep an electronic form of the record as it did here. It only kept the GPS coordinates even though that's not how it viewed the coordinates or used them at trial. And so, even in that circumstance, the 1996 FOIA amendments make clear that regardless of the form that something is stored, a requester is entitled to it and he or she is entitled to it in the requested form or format. And so, here, again, Mr. Aguiar would be entitled to the map form even though it is no longer saved in that form. And what happens as a result of the fact that because he is incarcerated, he does not have the access that an unincarcerated person would have to a computer if he could ping and print? I don't think, Your Honor, that an agency is required to consider the characteristics of the individual requester or the access they may or may not have, but I do think that Mr. Aguiar's situation does show exactly why Congress enacted this provision because the GPS coordinates are meaningless to anybody. They're meaningless to the DEA. They're meaningless to a requester who has access to a computer, and the statute makes clear that the agency is to maximize the usefulness of the information. And so, for anyone, regardless of access to a computer, the DEA is required to provide that information in the readable, usable form that it itself views it. Wait a minute. You say it's meaningless even to someone who had access to a computer. I assume that someone who had the resources, the time, could hire someone to plot these. The coordinates come with a time specification, right? So, they could plot these on a map, and it would be actually quite useful. As Judge Rogers said, if people are in the nautical world, they write down longitude and latitude, and it's precisely because that can be decoded, if you will, by reference to a map. Yes, Your Honor. I only meant to say that they are meaningless to anyone in their current form, and so some manipulation would be required, and some individuals may have the ability to do that, and that's why the statute provides the protection that the agency can pass direct costs onto the requester. So, the DEA is into the usable form that it does, but it can, of course, as long as it can readily do so, which is not disputed, but it can, of course, pass the direct cost of reproducing that information onto the requester. So, I only meant to say that this current information, the way it is stored, is meant to be read by a computer and to put into the usual form that is readable by the human eye. As Judge Rogers pointed out, the maps from the trial are destroyed. So, at this point, unless someone there had a photographic memory and could remember exactly what those maps looked like, you're asking the DEA to take these coordinates and to plot them on a map. What if they produced a map of the world and it had every country labeled, but no more detail than that, and it plotted all these coordinates on it, and let's say that it zoomed in and it wasn't just one map with all these 351 pages of coordinates, but however many pages you anticipate eventually being produced, let's say that that is produced, but I think you're imagining a Google map that says like, you know, Broadway and Main Street and Second Avenue, but they don't give you that much detail. They just say, here's a map. It's a map of the world, and here are your coordinates plotted. That's not going to satisfy you, correct? Correct, Your Honor, and to make sure I understand, it would be a map of the world, but it would be sufficiently zoomed so that you could tell the coordinates apart, but there would be no streets, no rivers, no even state lines, let's say, so that's not satisfactory, and I understand why it wouldn't do your client no good, or at least it wouldn't do your client any more good than the coordinates themselves would do, but isn't the fact that that is unsatisfactory? Doesn't that suggest that what you want is more coordinates plotted on a map? You want coordinates plotted on a map and additional descriptions of what's around the coordinates, streets in particular, and that's exactly what you're not allowed to ask for. You're not allowed to ask the agency to summarize or describe. I don't think so, Your Honor. I think that all that Mr. Aguiar is seeking is the coordinates plotted in a map form that the same way that the DEA regularly does it, but we don't know how the DEA did it in the trial. Nobody remembers exactly how much detail there was. Correct, Your Honor, but using the tools that the agency has at its disposal now, it is in the record that it has access to a web-based interface that allows it to plot maps, so presumably they're not of the world and they contain street names and the like, and I do think I do think that that information fits into the sort of, it is particular to the form of a map, so in the same way that if someone asks for a scatter plot, the agency couldn't give it without an X or Y axis or a scale. I think that that information is just part and parcel of what makes it a map, or if a requester asked for a native format of a document and the agency had both, I don't think the agency could wipe the additional formulas and the other kind of metadata that is part of the native format. Let me ask, in my head I have that there was a record before trial, the coordinates. The agency created a second record for trial, the maps with the coordinates plotted on it. That second record was destroyed. Now we only have the first record, and you're asking, you know, this is how I'm doing it. I know this is not how you do it. You're asking the agency to take the record that exists and to create a second record, and your argument is, well, they created a second record once at trial, so it's fair to ask them to create a second record again, but FOIA does not require an agency to create any records, any new records, so tell me why I'm thinking about that wrong. I don't think, Your Honor, that my argument is that because they created it once at trial, they need to create it again. My argument is that it is not creation of a new record when it is simply reproducing the same underlying information, which here is the GPS tracking data, in a new form. The 1996 amendments say that the record at issue is the information, regardless of its form or format. The record at issue is the information, regardless of its form or format. The agency currently has the form of a spreadsheet, but has to reproduce that in the form of a map. You told me earlier that the form of a map is not sufficient. It has to be in the form of a map with enough detail that you like it, but let me, right? I think it has to be in the form of a map with the characteristics that make a map form a map and make it recognizable as such. Well, I mean, my hypothetical map was a map. You know, there are a million maps of the world that just have countries on them. Let me ask one more hypothetical. Imagine that an agency has a document, 351 pages worth of it, and it has nothing but addition problems on it. So it has 2 plus 2, and the next line is 3 plus 5, on and on, and they turn this over to a FOIA requester, and the FOIA requester says, you know what, I want this in a different form. I want it to say 4 instead of 2 plus 2, and I want to say 8 instead of 5 plus 3. Now, I think if I apply your logic, that FOIA requester should get his way, because all you would have to do is enter that data, 2 plus 2, 5 plus 3, into a very basic computer program, and that very basic computer program will spit out 4 and 8 and on and on and on. Would you agree that if we apply your logic to that hypothetical, the agency would have to produce a document that says 4 and 8? I don't think so, Your Honor, or I at least think that's a closer question, because that requires some analysis of the actual underlying information in a way that this doesn't. The latitude and longitude are staying exactly the same, in the same way that a requester might not be able to ask for the mean, median, and mode of a set of data, but they would be able to ask for a scatter plot of a set of data, and so I really think it gets to whether the underlying information is being manipulated, or if it's just a different way of displaying or viewing that information. Let's put ourselves in the days before there were computers, because in the computer age, both of the hypotheticals can be done in two seconds, I think. There's a program that already exists, and you just enter the data, and it spits out what we're talking about spitting out, whether it's a Google map or whether it's the addition things, but back before there were computers, each of those, I think, would have required some analysis. I mean, it would have taken someone with math skills to figure out that 2 plus 2 equals 4, and it would have taken a cartography to analyze these individual coordinates and plot them with precision on a map, and, you know, history is full of explorers who weren't good enough at that, and they got lost, you know, so how is, how is it that your request does not involve the analysis that you think is not required under the statute? I think, Your Honor, because the coordinates just sort of presuppose a map, the longitude and latitude, although it might require, you know, if someone were doing it by hand, finding that spot, it is, it is, all that those are are showing a position on a map, whereas when you're talking about adding numbers, I do think there is a certain type of creating a new type of content, if you're talking about then adding what I get, if I gave you the two sets of data, the coordinates and the addition problems, and I also gave you an atlas, which do you think you would be able to do easier, plot the coordinates or do the math? Surely the math, right? That does seem right, but I don't think that that is the test for form or format. I think it's a test for analysis, how much analysis is required. Correct, but I don't think that the test is whether the analysis can be done easily or automatically or not. I think it's just whether you're having to really kind of manipulate that data, and I will grant you that that is a tougher question, because I do think that if an agency were to, for example, store images in binary code, it would need to produce the image that that do, and I think that is what the purpose of the 1996... What's the answer to that? Let's say the computer has it in binary code, and the FOIA requester wants it in something more user-friendly. The FOIA requester wins that case? Yes, I believe so, Your Honor. I think that's exactly what the 1996 FOIA amendments require is for the agency to provide it. Surely they are viewing the image in the readable format and would need to provide it in that usable form to the requester. Thank you very much. I just have a question from the government. Wait, I just have one more question, if I might. It's already been 30 minutes here, so... I'll ask you on rebuttal. Okay, great. Thank you, Your Honors. Counsel for the agency. Yes, good morning, Your Honors, and may it please the Court. I'm Assisting United States Attorney Johnny Walker, arguing on behalf of the Drug Enforcement Administration. I want to reorient to what Mr. Aguiar actually requested in this case, because it's actually very specific. It's not just any map. What he wants, as Judge Rogers noted, is the images and proprietary software associated with the information collected from the GPS device from January 23rd, 2009 through July 30th, 2009, the very same file used by DEA to prepare exhibits by trial. And he makes clear in the preceding paragraph of his FOIA request, and this is at JA-105, that he is looking for the exact data and images that DEA monitored while agents were tracking his vehicle. And in his FOIA appeal to the denial of that request, which is at JA-114, he makes further clear that he is looking for a corresponding satellite image plot for each ping on Google Maps at the lowest available altitude between 550 and 100 feet on the versions of Google Maps in place at the time the GPS tracking of my vehicles was performed by agents in 2009. So what Mr. Aguiar is looking for is very specific documents. He wants Google satellite images showing the pings of his vehicle, the very same images. He may not even be able to characterize that as a map, but the very same satellite images of his vehicle that agents viewed in 2009 while tracking it. Oh, it's not vague. It's very specific. Correct. He knows exactly what he is seeking because he has described it with such great particularity, but he doesn't have access to this one translating machine that he needs. And so the statute says, pay for it. You can get it in a different form. I think your honor, well, what the statute says is that you can have records that are in the agency's possession, custody, or control. And these are images that the agency no longer has. They conducted a search, the adequacy of which is not disputed, and it did not locate these images. What Mr. Aguiar is asking the government to do is to make them. He wants these images that the DEA saw. The DEA doesn't have them, and so he is requesting that the DEA create these images anew for him. And that is the creation of a record, plain and simple, and it goes against decades of FOIA precedent, precedent that this court has recently affirmed, by the way, in a case that postdated the briefing in this matter, and that's National Security Counselors versus CIA, 969F306, 2020 D.C. Circuit case from August, in which this court cited the long line of precedent from Kissinger to Forsham to Sears Roebuck to Yeager, emphasizing that an agency is not obligated to create records. Now what amicus must argue then is that generating these Google satellite images is not the creation of a record. And amicus acknowledges that I think her quote was that a change in the substance of information associated with a record is not a reproduction. It's not another form or format of the record, and that's exactly right. But there's no way that you can contend, I think, that a time does not add to the substance of a longitude and latitude pair. Let me ask you, Mr. Walker, some kind of technical questions, facts questions. If we ordered you to do what Mr. Aguiar wants, in my head, I think it is this simple, but the 351 pages of coordinates, select all, that takes a second, control A. You copy, that takes another second, control C. You go to Google Maps, that takes another second, and you paste, control V, that takes a fourth second. You press enter, and it pops up on the Google Map all these coordinates. Now, I've never done anything like this. What I think might take five seconds may actually take five minutes or five hours. And I guess, am I wrong? And if I'm wrong, walk me step by step how you would comply with the order if the order were what Mr. Aguiar wants. Frankly, Your Honor, there's nothing in the record that indicates there is any way to comply, even if the DEA were able to- You did it at trial, right? Well, the U.S. Attorney's Office presented evidence at trial, and what Agent Carter testified was that he assisted in the preparation of those exhibits. Those were not prepared- How is it readily reproducible? Let me ask that. The district court said that you conceded this is readily reproducible. Is that district court statement correct? No, we have not conceded it's readily reproducible. Our argument- Is it readily reproducible? All indications are that it's not, Your Honor. The exercise that you just laid out where these are cut and pasted- You contest that in your appeal. You didn't say the district court got that wrong. Do you think that you forfeited the argument that you're now making? No, Your Honor. I mean, the record shows- Why didn't you contest it in your appeal? Because our position, Your Honor, is that this is the creation of a new record, which is not- I get that, but to the extent the question of whether it's readily reproducible might be or a more straightforward way to decide this case, I'm just kind of wondering as a strategic matter, why didn't you say the district court was wrong? Well, it's in the record, Your Honor. I think- Assuming that the DEA could undertake the exercise that Your Honor described where these coordinates are put into Google Maps, and I know from my own personal experimenting that you can put a longitude-latitude pair into Google Maps online, and it will show you the location on Google Maps today, and you can get the satellite image today. But what Mr. Aguiar is requesting are the very same images that were viewed in the DEA's tracking program. And what we have in the record is that that tracking program does not permit for the agency to put in a latitude-longitude pair and to generate an image, that those images are viewed in real time. We also know that that program stores data associated with it for one year. Now, Mr. Aguiar's vehicle was tracked during the first half of 2009, and he submitted his FOIA request in 2013. So the underlying data here, frankly, was not even available to the DEA when it conducted its search. I just want to- Am I understanding this right? I know you don't want to lose. I'm not even saying I think that you should lose. I'm pretty skeptical of Mr. Aguiar's statutory argument. But if you lose and there's an order that says you have to do what Mr. Aguiar wants, you're saying that the DEA can't do it? They're just going to be in contempt of the court's order? The DEA would not be able to do it as far as I know, Your Honor. The further we got with that, the furthest the DEA got with that is it began to engage an outside contractor in an effort to try to produce the images that Mr. Aguiar sought. So it engaged that outside contractor, provided them with the data, and it got a quote that it would- an estimated $608 is what it would take to start producing those images. I don't know if those images would be exactly what Mr. Aguiar wanted, or if they would comply particularly with this FOIA request, because nobody got that far because he didn't prepay the cost. All right, but with all due respect, you haven't made the record. Support your argument. The record is there, Your Honor. The record does show that the- We will give you the maps if you pay $608. That's the case we have before us. And we're not, you know, talking about some other case. Very specific request. The agency's responses pay $608. You can have your maps. We know what you're talking about because we did this in the trial. I mean, don't we have to- doesn't the court at least have to deal with the case as it's presented to us? Certainly, Your Honor. I mean, but if the question is, are these maps readily reproducible by the DEA, the answer is no. We know that the- The agency was misrepresented to Mr. Aguiar when it said, pay us $608 because we have a contractor who can produce the map as we I mean, don't we have to stay within the record? There's no suggestion that DEA was misrepresenting the cost to Mr. Aguiar. The argument in the brief was, well, you didn't want to pay. I think the cost, even the cost that was provided to Mr. Aguiar was an estimate. They did not get so far as to say, this is exactly what will be produced and it's exactly what will be required. It was a cost estimate provided to Mr. Aguiar based on the DEA's consultation with an outside contractor. Do we know, Mr. Walker, an estimate for what? Not exactly, Your Honor. It was to reproduce images. We know that it had something to do- that it was an audiovisual contractor and that the estimated cost was to produce images. You got a bid to do something, but you don't know whether something is? Yeah, I don't think- it's not in the record, Your Honor. There was- all we have is the letter that was provided to Mr. Aguiar saying that that was the estimated cost that he would have to prepay in order to engage this contractor. The contractor never began any work or articulated precisely what would be produced. Now, I wouldn't know, Your Honor. I mean, this all gets past the argument that the DEA is making, which is that what's being asked in the first place is the creation of a new record, which goes against decades of FOIA precedent and is not required at all by the FOIA statute. What the DEA was offering- Counsel, what would happen in this hypothetical? Somehow, Mr. Aguiar gets his case- his criminal case before the Supreme Court. The Supreme Court sends it back for a new trial. The U.S. Attorney's Office has to figure out what is it going to do. It decides it wants to retry him. So, it works with your agent to produce the evidence it needs for trial. I mean, we're not in a never-never land here, except for the hypothetical that the Supreme Court is going to reverse the underlying criminal conviction. But don't you have to deal with it in that sense? What would the agency do? We don't have a record that shows it's impossible for the agency to introduce the type of evidence that it introduced at his original trial. That may be so, Your Honor, but as a legal matter, the agency does not have to create all records that's possible for the agency to create in response to a FOIA request. I understand that, but I just want to get past this hypothetical you're dealing with, that they couldn't do it. That is not the record we have before us. Whether they legally have to do it for all these reasons the district court gave, for all the reasons you give in your brief, that's a different question. Certainly, Your Honor. I'll put it this way. There's no indication that the DEA could do it using tools available to them. The only record that we have on this instance is that they had begun the process of consulting with an outside contractor, got an initial estimate, and that was an amount that Mr. Aguiar did not pay. Even amicus acknowledges that a requester can be asked to bear the cost of records, assuming that would be a requirement of the FOIA for the DEA to engage an outside contractor to create records for a FOIA requester, which we strongly do not believe is the case. Even if that were the case, amicus acknowledges that that is a cost to be passed on to the requester. Here, the requester did not pay the cost. It's not as clear to me as your characterization suggests that the offer was made to Mr. Aguiar. You'll get the maps you want if you pay this amount of money. The record we have is much more vague about what that $608.25 would produce. It's processing by an outside contractor. That's right, Your Honor, which is why I'm hesitant to say that this was something that would satisfy Mr. Aguiar's request. We're certainly sensitive. These do seem to be sort of initial consultations with the contractor in a preliminary process provided by the contractor. Right. So, to me, what's difficult about this case, and the questions by my colleagues have really been helpful in highlighting this, this isn't a situation where, you know, the agency wants to have the arithmetic math sheets and some requester says, oh, it would really help me if I had, like, the answer key where you add it all up. The way, and really the only way, the agency uses this information is as visual representation on a map. That's the only way the agency uses it, as far as I can tell from the record. And so, to the extent that it's retained this information, it's retained this information just the way my computer retains ones and zeros on all the documents that I want to work on. And it just wouldn't make sense that I could give sheets of ones and zeros in a FOIA request if I were subject to FOIA and say those are the documents that I have. And I think it's complicated, frankly, by a couple of things. One, that the software is no longer licensed. So, if I had an old computer, you know, and I really did only have the zeros and ones, you know, what would my obligation be in producing? But to me, the strongest case for Mr. Aguiar is, you know, presumably in preparing for trial, the agent and the AUSA looked at days and days and days of journey maps. You know, and here he did this on this day. The next week, he did the same thing. And he stopped at Farrell Street and he went to the Casella Waste and he, you know, again, he did this extra stop in wherever it was, Malden, outside of Boston, you know, and they looked at the maps to see the regularity. And then they decided which ones to print for trial. And what Mr. Aguiar wants is that same look because presumably the AUSA printed only those that that the AUSA's office thought was going to make their case and he wants to see the rest of it. And so, the use in the ordinary courts, the only use is as mapped. And to me, that seems to distinguish this case from a lot of the other record production cases. I'm not sure it gets them all the way there, but what's your best answer to that narrower view about why this might not really be creation of a new record? Well, Your Honor, I think what the cases make clear is that it's not only, agencies are not only not obligated to create new records, they're not obligated to retain or recreate records that once existed. And so, while yes, it is true that the DEA did view maps on a computer that were generated in real time as a result of this GPS system, that was in 2009. And there's no dispute that those ping reports, those satellite images associated with those pings are no longer available to the DEA, no longer has them and did not find them after conducting a reasonable search. And it is just as much, if not an obligation of the DEA to recreate or retain the record as it is for it to create a new record. I'll note that Your Honor is absolutely correct that there, you know, technically every PDF document is stored on a computer in the form of ones and zeros. But at the end of the day, the expression is that it's just a PDF document. I mean, this is exactly, I think what the E-FOIA amendments were meant to clarify is that a record that is stored on a computer as an electronic record is nevertheless still a record. But that's certainly not the case here. This is not an instance of the DEA trying to be cute with, you know, a record just because it's electronic is not a record. The only information that was located here, and frankly, that spreadsheet of coordinate data was not even located in the DEA's own search of its field office and the investigative files of Mr. Aguilar. It went to the U.S. Attorney's Office to obtain that spreadsheet of data. And that is the record at issue here. Now, nobody's saying because that's stored electronically or because that ultimately boils down to ones and zeros, it's not a record. What we are saying here is that the DEA is under no obligation to take the content of that record and create a new record of significant supplemental and additional content, as Amika phrases it, a change in the substance of the information. That's actually helpful because it did seem like the U.S. Attorney's Office would be the likely situs of map information. So, as I was imagining, Agent Carter sits with the Assistant U.S. Attorney, and they look, they pull up this data through some software interface and look at a bunch of maps. And only a small subset of those are printed out and used as exhibits. And I guess the question is, what do we know, and probably in the record I should have a more precise recollection of this, but what do we know about Judge Rogers' question, were the U.S. Attorney's Office confronted with the requirement to retry the case? Your position is they'd have to hire an outside contractor to print maps. I frankly don't know, Your Honor, what they would be capable of in terms of the data that's Agent Carter testified that he assisted the United States Attorney's Office in the preparation of the exhibits for trial. We don't know what actually went into that preparation. Actually, the DEA attempted to find out in response to Mr. Aguiar's request. They tried to contact Agent Carter, who at that point was retired, and they were unable to do so. So, all we know is that he somehow assisted the U.S. Attorney's Office in creating these docs that are exhibits at trial. And essentially what Mr. Aguiar is asking the DEA to do is do the same thing for him. But because that is the creation of a new document that's not currently in the DEA's possession, it's outside of the bounds of a court order. Go ahead. We don't know whether if the U.S. Attorney's Office were asked, can you log onto a computer today and pull up this information as plotted on Google Maps, let's say, a separate map for every journey. We don't know whether they could do that in-house. U.S. Attorney's Office, we do not know if the U.S. Attorney's Office could do that in-house. Do you know if the DEA could do that in-house? No, we don't know if they can't. We don't know. We don't know. Do you know if the DEA could do it in-house? It does not appear that they can, Your Honor. We know that the tracking device software that they use does not permit inputting coordinate data and generating maps. And they didn't do it the first time. Either the U.S. Attorney's Office or an outside contractor did it the first time in 2009, correct? It appears that way. Agent Carter did not testify that he created these exhibits. It is not the DEA who presented them at trial. Agent Carter testified that he assisted in the creation of these exhibits. He did note that the pictures that we look at, the individual maps with the PING reports on them, he did note that he called it a screenshot. So that is what he sees when he's looking at the PING reports in real time. This is a very small point, but did you say that the DEA had not been able to find Agent Carter, retired Agent Carter? It attempted to contact Agent Carter and was unable to contact him, just to ask how these trials were supposed to bear. I mean, it's a law enforcement agency. It seems like it, you know, tracks down fugitives and stuff all the time. But I don't have any more questions. I don't know that they brought quite the same resources to bear in tracking down Agent Carter as they do in tracking down the state case. That's fine. It's fine. It's fine. In terms of the request was made of the DEA, but they nonetheless also sought information from the U.S. Attorney's Office, what's the nature and limits of that obligation? I don't think there is any obligation, Your Honor. I think this is just something that the DEA did in order to try to satisfy a FOIA requester's request for documents. I think the same is true of its attempt to engage an outside contractor to try to create these images. There's no obligation in FOIA that the DEA create images, but I think it went above and beyond its obligations in trying to find a contractor that could do that. So, what I was going to say is that under FOIA, the assumption is the records will be turned over unless the agency can invoke an exemption or some of the case law. And Kissinger was decided a long time ago, and we have a whole new development in the world of communication now that the statute acknowledges. So, the statute itself has already increased the agency's burden when something is readily producible in another form or format. So, as Judge Pillard suggested in her question, if the only reason that this raw data that was turned over to the requester was in an effort to provide him what he necessarily the sequence, but this is not a case where the agency has told us there is no way this can be readily reproduced. In fact, what we had here was a contractor who was proposing to do this for us for $608. So, the question in my mind is in that fact scenario, if the agency only has this information for one purpose, and that's precisely what it used it for in connection with Mr. Aguiar, then what is the agency's burden here? How is it going to define form or format where the agency doesn't have this list and only uses PINs in connection with maps? What should the arguably the playing text of the statute and Congress's increasing determination to broaden access to government information that is outside of these exemptions? Why wouldn't this court ask, absent the agency making any statement that it's impossible to do what Mr. Aguiar wants? And we're going to make him pay for it anyway. And if he wants to pay $5 million to get somebody to do this translation, so be it. But the legal question would be, what is he getting that's different than what the agency itself has the information for? Don't we have to come at questions that way? I think, Your Honor, the way to come at the question is not what the agency is capable of creating, what records the agency is capable of creating or recreating that once existed. Because a long line of FOIA precedent, as I say, affirmed by this court most recently in August 2020, it's very clear that FOIA does not require the agency to create, recreate, or retain records. And so the question is simply, is the exercise that Mr. Aguiar asking the agency to do, does it require the creation of a new record? Now, what he wants are thousands and thousands of images on a Google satellite. He wants Google satellite images from 2009 that the agent looked at when it was tracking his vehicle. I guess what I'm trying to get at is this case is a little different than the other cases. And that's what the whole amicus brief was all about. That's why the court, I assume, appointed amicus. Get at this sort of cutting edge and decide where this case falls. And you can agree with the district court that putting on the information about what Judge Walker talks about, the rivers, the streets, the stores, that's creating an entirely new record. And the agency has no obligation to do it. So if Mr. Aguiar wants to get this information, the only thing he can do is, and I don't know whether criminal defendants even have the authority to do this, is to enter into an outside contract for a translator. So he can get these Google maps. And one of the questions I was thinking about, okay, you don't look at who the requester is, but do you look at it in terms of can the information the agency turns over be of any use? It clearly isn't the use he wants. That's not what he's asking for. He wants these maps. And so what is the agency's burden to show? I understand if the agency can show there is no way it can do this, irrespective of whether it has a legal reason to do it. But that's not the approach that's taken here. And how do we draw the line? And counsel, Amicus offered some lines, and I was waiting for you to come up with your lines. Well, Your Honor, luckily, we agree with Amicus that the line is at least that a new record involves the change in substance of information to the record that is, quote-unquote, being reproduced. Where we disagree with Amicus is that a Google satellite image from 2009 showing time location has a different substance, materially different substance, from an Excel spreadsheet of longitude and latitude numbers. So I think Amicus's assumption is built on this notion that there is no difference, no substantive difference in content between an Excel spreadsheet of longitude and latitude numbers and an actual satellite image from a given point at a given place. That seems, and I get it, that the request, the very specificity of the request, which, frankly, looking at it retrospectively, seems a bit misdirected because there's no such thing as real time in retrospect, right? So I get it that there's a technicality there that invites you to view the request with a similarly technical lens. But stepping back from that, presumably there's just a standard that the U.S. Attorney's Office uses day in and day out when they're looking at drug transactions in such and such a court, in such and such a neighborhood in D.C. that is illuminating, that they take this kind of information and they're like, okay, we want to see basic street level, and it's not like new roads have been built in this area. So the fact that it was 2009 and now it's, to me, the thing that distinguishes this case is that there's a kind of everybody knows what he wants and what's useful to them aspect to it. And indeed, I find myself wondering, was the tracking information as was available to the U.S. Attorney's Office to review in preparation for trial and to select, why was the full amount of all that information on, let's say, daily maps not braiding material? If I were Mr. Aguiar and, you know, thinking like, what? Why are they seeing this? You know, I want to see it in context. It wasn't, that wasn't braiding material to say, okay, here, here's all the information we have about all your trips, and here's what we're deducing. We don't know that actually the DEA ever retained or created or had in its records every image of a ping report. Certainly, there were probably times when, I mean, these devices were attached to Mr. Aguiar's car for a very long period of time. Sometimes they were sending reports. You can see an example in the record, sending reports every minute. So, there's no indication that DEA saw every image or that every one of those images was actually retained somewhere. What we know is that the images that were presented at trial and numbered as exhibits, that Agent Carter assisted the United States Attorney's Office in some way in creating them. And what- Let's say what was retained is just the, and we do know that what was retained is at least the information in the spreadsheet. Correct. Agent Carter did testify to that. Right. So, what I'm saying is that if that could be, and presumably was, flipped through as a series of maps to select the ones that lawyers wanted to use at trial, there were some that were not selected. And what I'm asking is, at the time of trial prep, why wouldn't that have been Brady material? Or was it? So, I don't know. I don't know that that was the case, that there was a series of maps that were flipped through and selected and that others were not provided to Mr. Aguiar. I do know what Mr. Carter testified to, Agent Carter testified that he described the images that were admitted as exhibits as screenshots. So, one possibility is that Agent Carter took some action to actively take a screenshot of his screen, whatever screen on his computer he was using to monitor Mr. Aguiar at certain opportune or significant moments in the investigation. But there is no indication that actually all of these maps were collected and all of them were gone. And frankly, there would be many of them as every indication. There are 351 pages of that spreadsheet that were produced. The first one, which is in the record, I count 46 entries on it. By math, that comes to about 16,000, well over 16,000 individual coordinates that are likely on these spreadsheets. So, that would be many, many, many thousands. Right. I'm looking at, so, am I right that, for example, JA 96, maybe 92, 93, 94, 95, that those are the screenshots? And that JA 97, which shows the more of a, what I've been referring to as a journey, that that would have been one of the exhibits. So, the 68D, exhibit 68D, that's JA 97, is different in kind from the more oblong, darker ones, which, frankly, we can't even see. So, some are screenshots and some are not. Is that, do we know that or not? It's not crystal clear in the record, Your Honor. Agent Carter does use the word screenshot to refer to the darker oblong images that have sort of the little, the speech bubble with the report date, report time, et cetera. And he does testify that he worked with the United States Attorney's Office to create the exhibits. So, I would assume that the sort of Google map showing, you know, point A to point B in a route were created for some other means other than the No particular comment, one way or the other, as to whether there's any Brady aspect of this information. I don't know, Your Honor. I certainly don't know that there would be been any Brady violations. I don't know that all these maps existed. I don't know what was provided to Mr. Aguiar as Brady materials. I do know what he's certainly looking for now is all of the images. As I said, there's no indication that those ever existed. All right. All right. If there are no further questions, I'll conclude by asking that the district court's judgment in favor of the DEA be affirmed. Thank you very much. Thank you. So, Amicus, we'll give you a couple of minutes. Thank you, Judge Rogers. Just a couple of clarifying points. The agency has never argued that Mr. Aguiar's request here does not cover the GPS coordinates plotted on maps using the that Mr. Aguiar's request was not specific enough to request that. And, of course, if it had felt that way, its regulations require it to go back to Mr. Aguiar and ask for a more specific request. So, the request issue here is just all Mr. Aguiar is asking for is for the 351 pages of GPS coordinates to be plotted on maps using the technology that the DEA has. And on that point, the DEA has never disputed that the maps are readily reproducible. There have been six agency affidavits. It has been up to this court already once. Never has the DEA said that it could not readily reproduce the map images, and that argument is forfeited. And we cross moved for summary judgment, of course, in the DEA in its response to not say that they were not readily reproducible. And it is all over the record that there is commercially available technology for doing this. And, in fact, I heard Mr. Walker to say that the record suggests that the agency cannot put in coordinates and print them, and that is, in fact, not in the record. If he was referring to the Roy Declaration at page 109, that only says that the past technology that was used to monitor could not be used to input coordinates, but not that the current technology has the same limitations. And, of course, it has been admitted that if not that monitoring technology, then other technology can be used to input coordinates and readily reproduce the maps Mr. Aguiar is requesting. As to the $608 fee, the letters at Joint Appendix 106 and 111 show that that fee was for initial processing. The agency learned only after Mr. Aguiar sought a fee waiver that it was for the agency only learned after Mr. Aguiar sought a fee waiver that the CD contained spreadsheets. And so the agency has Ms. Stossel, can you answer the question I asked Mr. Walker about just the logistics? Is this really as simple as copying and pasting? The record does not reflect that, Your Honor. I do think that it could be as simple as putting a bunch of the spreadsheet in at once and, yes, copy and pasting. It could be as simple as a click, but the record does not reflect that clearly. One more. What do you think is the least, I know you can't know exactly how many pages this would be printed out with the stuff plotted, 15,000 coordinates. It won't be 16,000 pages because there'll be multiple coordinates on a page, but you can't put all 16,000 on one page. What is the least amount of pages that you can imagine this result again? I think, Your Honor, it's at least imaginable. I believe there are around 50 coordinates on a potentially fitting all on a single map, so that would be around 350 maps. Maybe there could even be more of it. That doesn't make any sense to me, and I feel like you're asking for something that will be supremely frustrating to Mr. Aguiar. Wouldn't he want, and I keep saying this, and maybe it's just in my own fevered imagination, but wouldn't he want a separate map for every actual journey? In other words, if you plot today's driving, and tomorrow's driving, and the next day's driving, and the next day's driving on the same map, you're going to get like an Etch-A-Sketch in the hands of a two-year-old. It will be incomprehensible. I think, Your Honor, maybe I'm misunderstanding. I think that would essentially be what, for example, 350 maps might look like, because Agent Carter could set up the things to be happening every minute, and so it would essentially look like a journey for that day, potentially. But if you're not careful in saying that a separate day needs to be a separate map, you could get, as I said, a kind of a, over and over and over and over, all mushed together, and it would be non-informative, which is why, for my comprehension, it just seems important to think about how the government actually uses maps and electronic tracing information. They do this all the time, all the time. This is not an exotic kind of information, and I'm guessing that they never pull it up as a list of coordinates. They pull it up as maps, and they never pull it up as 10 days or 100 days maps all on one sheet of paper. I agree, Your Honor. I think we're starting with Mr. Aguiar's request, which does not contain that level of detail, but which I think has to be, when we're talking about whether something is a different form or format, that has to be read against the purpose of the statute, which is in the purpose provision to maximize the usefulness. Here, it's easy to see what the agency would be required to produce, because it's the form that they themselves use it. Just as you said, the way that we know, we can see from the record, from the maps in the record, what something like this would look like, and the way that the agency usually uses this information and, in fact, exclusively uses this information as far as the record shows. Yes, I don't think the agency would be fulfilling its obligation by providing something that's amush or unreadable. It needs to provide it in the form that it commonly uses. To the extent that there are difficult questions at the outskirts of what is a form or format, this case easily fits within that broad any form or format language, because we know exactly how the agency views these coordinates to make them readable. I don't think that, Your Honors, that Mr. Walker has proposed a test to put the limits that he would read into electronic and non-electronic into that any form or format language or the like, coded or uncoded, zipped or unzipped. I simply think that those limitations do not exist in any form or format language, and the protections in the statute, the readily reproducible, where the agency is entitled to substantial weight on that opinion, and the fact that it can pass on fees, those are the protections for the agency. It's not by reading limitations into the broad any form or format language where we know that Congress was trying to provide access in the most usable way. All right. Thank you. We will take the case under advisement.
judges: Rogers, Pillard, Walker